UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JODY S. CURL,                                    )
                                                 )
                        Plaintiff,               )
                                                 )
            vs.                                  )        No. 1:15-cv-01060-LJM-TAB
                                                 )
CAROLYN W. COLVIN Acting                         )
Commissioner of the Social Security              )
Administration,                                  )
                                                 )
                        Defendant.               )

## ENTRY ON JUDICIAL REVIEW

Plaintiff Jody S. Curl ("Curl") requests judicial review of the final decision of
Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the
"Commissioner"), which denied Watts' applications for Disability Insurance Benefits
("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the
Social Security Act, 42 U.S.C. §§ 416, 423 & 1382c.  Curl asserts that the Administrative
Law Judge ("ALJ") erred when he (a) failed to properly address Curl's limitations in
concentration, persistence or pace, or memory deficits in his hypothetical to the vocation
expert ("VE"); (b) failed to give proper weight to Curl's treating physician's opinion; and
(c) failed to provide a logical bridge between uncontradicted evidence of Curl's stress
incontinence and her medically determinable impairments.  The Commissioner contends
that the ALJ properly accounted for any mental capacity limitations by including Curl's
GED Reasoning Level in his hypothetical; he properly afforded little weight to Curl's
treating physician's opinion regarding her use of cane; and that the ALJ properly
determined that Curl's incontinence was not a severe impairment.

# I.  BACKGROUND

## A.  PROCEDURAL HISTORY

On July 21, 2012, Curl filed her applications for DIB and SSI.  R. at 136-44. Therein, she alleged that she became disabled on September 12, 2011, due to symptoms associated with depression, back surgery, arthritis, anxiety, an "over active bladder," hot flashes, bipolar disorder, chest pain, sleep apnea, and esophageal reflux disease.  R. at 163.  Curl's application was denied initially and upon reconsideration.  R. at 73-76.

Curl timely requested a hearing before an ALJ, which occurred on February 7, 2014, at which Curl appeared with an attorney and testified.  R. at 32-72.  A VE also testified.  R. at 32-72.

On March 27, 2014, the ALJ issued his decision in which he denied Curl's applications because she was able to perform jobs that existed in significant numbers in the national economy.  R. at 11-26.  On May 12, 2015, the Appeals Council denied Curl's request for review and the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.982, 416.1481.

On July 8, 2015, Curl filed the instant appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## B.  AGE, EDUCATION, WORK HISTORY & CURL'S PERCEPTION OF HER IMPAIRMENTS

Curl was forty years old at the time of the alleged onset date.  She has a high school education.  Curl has past relevant work as a tree trimmer, certified nurse assistant, and stock clerk.  R. at 62-63. At the hearing, Curl testified that her back is her major limitation.  R. at 43.  She claimed that her pain in the two years prior to the hearing averaged a 9 without mediation on a 10-point scale; a 7 with medication.  R. at 44.

Curl also testified that her doctor prescribed a cane, which she was using at the time of the hearing, to address her complaints that, periodically, her right leg would go numb and give out.  R. at 47.  Curl stated that she could only stand for approximately five minutes and walk only two minutes without a cane.  R. at 48.  She claimed she could stand or walk with her cane for five minutes.  *Id.*  Curl stated that she could only sit for five minutes without pain.  R. at 49.

Curl testified that she experienced an injury at work, but did not receive Worker's Compensation for it.  *Id.*  Even though she had surgery on her back in 2006, she worked quite a bit in 2010 and 2011.  R. at 50.  Curl testified that she worked through the pain during that time out of necessity, but the pain has gotten so bad that she can no longer work through it.  *Id.*; R. at 55.  Upon questioning by her lawyer, she stated that she does not drive herself to appointments because if there is a bump in the rode, the sharp pains in her back can be paralyzing.  R. at 56.

Further, Curl stated that for the two years prior to the hearing, she was extremely depressed, the worst possible rating, with medication.  R. at 51.  Curl receives treatment of her depression from her primary care provider; she has never been to a mental health therapist.  R. at 51-53.

Curl testified that shortly before the hearing, she had an EGD because she had been complaining of gastrointestinal issues.  R. at 36, 55.  She claimed that she has had ulcers and adhesions that need to be removed every couple of years.  R. at 55.  Curl stated that she has stomach issues every three to four days, which causes her terrible pain for an hour to three hours.  R. at 56.

Curl also complained of chronic insomnia and testified that there are periods of as

3

long as five days during which she cannot sleep, even with the help of medication.  R. at 56.

Curl testified that she lives with her two sons who do all the cleaning, cooking, laundry and other chores because she cannot do it because of her back pain.  R. at 57. She stated that approximately four months prior to the hearing she had tried to go grocery shopping, but had to stop after five minutes because she could not go on because of pain. R. at 57.

Curl also reported that she had carpal tunnel surgery on both wrists and has poor circulation in her hands, which makes it difficult for her to work with them consistently.  R. at 57-58.  Similarly, Curl testified that every couple of months her feet swell and she has to prop them up above her heart; this condition last several days up to a week.  R. at 58. Curl also reported difficulty with an overactive bladder that causes her to use the restroom up to 50 times in an eight-hour period.  R. at 58.

Finally, Curl stated that her medication sometimes makes her sick to her stomach and she has reported the problem to her primary care physician.  R. at 60.

## C.  RELEVANT MEDICAL EVIDENCE

### 1.  <u>Treatment Records</u>

On September 10, 2010, Curl sought treatment for legs that jerk at night and wake her from sleep.  R. at 351.  She reported having trouble with nodding off to sleep during the day and almost falling asleep while driving.  *Id.*  Further, her quality of sleep was poor. *Id.*  At that time, Curl stated that she worked from 10:00 p.m. to 7:00 a.m., and wondered if the shift work was part of the problem.  *Id.*  She also reported suffering from stress

incontinence.  R. at 354.  On examination, the nurse practitioner noted unremarkable results in all major areas, except depressive disorder, possible hypercholestrolium, and malaise and fatigue.  R. at 353-54.  The nurse practitioner recommended several tests. R. at 354.

As a result of one of the tests, Curl started Lovastatin for high cholesterol.  R. at 355.

Also in follow up to her exam on September 10, 2010, on September 14, 2010, Curl presented for a pelvic examination, the majority of which was normal.  R. at 358-62. She was diagnosed with stress incontinence and prescribed medication.  R. at 360-61. *See also* R. at 372.

Upon referral from the nurse practitioner, on or about October 12, 2010, Curl underwent a polysomnogram, which revealed a rare apnea, but was otherwise normal. R. at 290.

On her follow up visit on November 3, 2010, with Dr. Joven, her primary care physician, Curl reported that she gets "antsy" while waiting at work, but her depression has improved.  R. at 367.  She reported continued difficulty with leg jerks and issues with her legs feeling as though they would give out at work.  R. at 368.  She was generally diagnosed with the following problems:  hypercholesterolium; osteoarthritis; low back pain; anxiety; and depressive disorder.  R. at 369.  She was prescribed medication for all of her symptoms.  R. at 369-70.

On or about February 9, 2011, Curl reported to the hospital with severe abdominal pain consistent with previous issues with abdominal adhesions.  R. at 439.   She underwent an adhesiolysis to remove abdominal adhesions.  R. at 439-40.

On October 3, 2011, Curl reported to Dr. Joven that she was having difficulty laying down due to pain, rated at 7.5/10, which caused nausea; and pain in her lower abdomen. R. at 395.  A physical examination showed limited range of motion in the back with flexion reduced to fifteen degrees with severe pain; inability to extend secondary to severe pain; and lateral side bends reduced to thirty degrees bilaterally with pain.  R. at 395-96.  No other abnormalities were notes.  R. at 396.  Dr. Joven prescribed Flexeril and Oxycodone for her low back pain, and a Toradal injection administered that day.  *Id.*  The doctor also ordered a lumbar spine x-ray.  *Id.*

On February 7, 2012, Curl was seen in the emergency room at Hancock Regional Hospital when she fell through a ceiling and was caught on a rafter.  R. at 249.  She was complaining of low back pain, and reported her history of same and multiple back surgeries.  *Id.*  Upon examination, the physician noted a hematoma and abrasion on the left flank area, with tenderness over the abrasion and over the lower lumbar spine and paraspinal areas.  R. at 250.  An X-ray of her lumbar spine, left knee and hip showed no acute problems.  *Id.*  Curl reported feeling much better after medication and her hematoma had not expanded since she had arrived in the emergency room; she was released for home care.  R. at 250-51.

On February 10, 2012, presented to Dr. Joven with low back pain.  R. at 398.  She reported that on February 7, 2012, she was in the attic and put her foot through the floor to the ceiling below.  R. at 399.  She was seen and treated at a hospital on that date.  *Id.* Upon examination by Dr. Joven on February 10, 2012, he reported slightly diminished range of motion on flexion, extension, lateral side bends (especially toward the left), and torso twists due to pain.  *Id.*  All other functions were normal.  *Id.*  Dr. Joven adjusted Curl's medications.  R. at 400.

On May 7, 2012, Curl reported back to Dr. Joven because she was having trouble sleeping.  R. at 401.  She also reported pain in her right lower back that spreads in to her right leg.  R. at 403.  She claimed that occasionally when she takes a step with her right leg, she falls and has to catch herself.  *Id.*  Upon examination, Curl had tenderness with palpation along the thoracic lumbar spine as well as adjacent on the right side over the SI joint.  R. at 403-404.  Curl reported increased discomfort with forward flexion and twisting of her torso bilaterally.  R. at 404.  There was no redness or bruising along the areas of tenderness.  *Id.*  Dr. Joven prescribed a different pain medication.  *Id.*  She was ordered to call back if she failed to see improvement within a week.  *Id.*

On July 14, 2012, Curl went to the emergency room with complaints of sharp central chest pain that is worse with inspiration and noted having experienced episodes like this intermittently for two to three years.  R. at 234.  Examination and test results were generally normal.  R. at 236-38.  It was suspected that she has GERD with an esophageal

spasm.  R. at 238.  Prilosec was prescribed; Curl was released to home care and ordered to follow up with Dr. Joven.  *Id.*

On July 20, 2012, Curl returned to Dr. Joven reporting diffuse low back pain that radiates down her left leg, increased depression with thoughts of suicide, but no plan and hot flashes.  R. at 409.  She reported being very upset and that she doesn't care about life and that Lexapro is no longer helping with her mood swings.  *Id.*  Upon examination, there were no physical signs of distress.  R. at 410.  Dr. Joven adjusted some medications and switched Curl's psychiatric medication.  R. at 411.  He instructed Curl to call with an update in 2-3 weeks and to return in approximately 5 weeks, but sooner if she experienced any problems.  *Id.*

On December 27, 2012, Curl underwent an upper GI endoscopy which revealed esophageal plaques suspicious for nonilial esophagitis and small hiatus hernia.  R. at 515-16.

On January 17, 2013, Curl reported to the emergency room complaining of nausea, vomiting and diarrhea.  R. at 500.  She complained of left side abdominal pain, but no fever or chest pains.  *Id.*  Upon examination, the physician reported tenderness to palpitation in the left periumbilical area, but otherwise no abnormalities.  R. at 502.  A CT scan was ordered and evidenced focal colitis.  R. at 502-504.

On March 27, 2013, Curl sought treatment at Community East Hospital for left shoulder and right hip pain.  R. at 454.  She reported that she fell two weeks prior trying to pick up her nephew.  *Id.*  Curl stated that she has known arthritis in the right hip, which

8

has been known to give out on her from time to time.  *Id.*  She has been ambulatory, but claimed that the pain worsened with movement.  *Id.*  She also reported a productive cough and pain with same.  *Id.*  On examination, Curl showed decreased range of motion in the left shoulder with tenderness and pain, but was otherwise normal in the shoulder.  R. at 457.  She exhibited crepitus in the right hip as well, but was otherwise normal in the hip. *Id.*  X-rays of the right hip and chest revealed no abnormalities; and EKG was also normal. R. at 458-59.  She was prescribed Ketoprofen for pain and sent home.  R. at 459-60.

On April 9, 2013, Dr. Joven prescribed Curl a standard base cane; no diagnosis is given on the prescription.  R. at 569.

On May 14, 2013, Curl was seen by Dr. Joven for follow up on her historical issues of chronic low back pain, postmenopause, sleep shift disorder and depression.  R. at 526-27.  Curl reported bilateral ringing in the ears; that her legs feel like they are being stuck with needles or knives; pain from head to toe; that her anxiety and depression were getting worse; and difficulty sleeping.  R. at 527-28.  She claimed that it hurt to sit, stand, walk or lay down.  R. at 528.  The doctor noted that Curl claimed she was dyspneic upon exertion and in severe pain after walking fifteen feet or less.  *Id.*  She also complained of peripheral edema bilaterally.  *Id.*  Dr. Joven also noted that she complained of an abnormal gate, tremors, and anxiety.  R. at 529.  Upon examination, Dr. Jorven found bilateral edema in Curl's ankles and feet, but she could mover all extremities well.  *Id.*  He found Curl reported pain on palpitation medially and lateral malleolar bilaterally.  *Id.*  As a result of the examination, Dr. Joven changed her prescriptions for Oxybutynin, and Lexapro, discontinuing Vilazodone; added a prescription for Zolpidem Tartrate for insomnia; and added prescriptions for prednisone and oxycodone for her low back pain,

neck pain and muscle weakness.  R. at 529-30.  He also changed other prescriptions related to anxiety and estrogen replacement.  R. at 530.

On September 13, 2013, Dr. Joven, wrote a statement that he was treating Curl for chronic lower abdominal pain, left knee pain, right hip pain, insomnia, anxiety, bipolar disorder, and overactive bladder syndrome.  R. at 441.  He stated that she has been unable to work for the previous two years; requires the use of a cane to ambulate; and needs to take a break to urinate every 60-90 minutes.  *Id.*  Dr. Joven wrote further that Curl had recently been diagnosed with a mixed connective tissue disorder for which further testing would occur.  *Id.*  Dr. Joven opined that Curl was "unable to perform any work outside the home secondary to her chronic pain, orthopedic issues, weakness, diminished stamina, and mood disorder."  *Id.*

On December 11, 2013, Curl presented to Dr. Joven for a follow up on her complaints of knee pain.  R. at 483.  She complained of ongoing all-over pain of 9 or 10 out of 10.  *Id.*  Curl also claimed that anytime she ate, she vomited; and was avoiding greasy or spicy foods.  R. at 484.  Curl also complained of chest pain, lower abdominal pain and clammy hands and feet.  *Id.*  Dr. Joven changed Curl's gastroesophageal reflux disease medicine and also recommended treatment for migraine headaches.  R. at 485-86.  He recommended follow up on January 20, 2014, unless there were problems sooner.  R. at 486.

On January 20, 2014, Curl presented to Dr. Joven for a follow up on her GERD.  R. at 479.  She reported abdominal pain, nausea, vomiting, dysphagia and reflux; and depression caused by several deaths in the family.  R. at 480-81.  Dr. Joven diagnosed

Curl with helicobacter pylori gastrointestinal tract infection, for which he prescribed medicine.  R. at 481.

On the same day, January 20, 2014, Dr. Joven completed a physical residual functional capacity form regarding Curl.  R. at 495-99.  Dr. Joven's diagnoses included chronic low back pain, chronic abdominal pain, bipolar disorder, esophagitis, hiatal hernia, and helicobacter pylori gastritis.  R. at 495.  He opined that Curl's pain and other symptoms are constantly severe enough to interfere with attention and concentration needed to perform even simple work.  *Id.*  Further, he opined that Curl cannot walk any city blocks without rest or severe pain; she can sit for ten minutes at one time; she can sit for less than two hours total in an eight hour workday; she can stand ten to fifteen minutes at one time before needing to sit down or walk around; and she can stand or walk about two hours total in an eight hour workday.  R. at 496.  In addition, he claimed that Curl needs to walk around for one to two minutes approximately every ten minutes; needs to lay down three to four times per day for one to two hours; and would need to take unscheduled breaks of one to two hours three to four times per day during a workday as well.  *Id.*  Dr. Joven also stated that Curl should have her legs elevated above the heart when sitting for a prolonged period of time.  *Id.*  She also must use a cane or other assistive device when standing or walking.  *Id.*  Dr. Joven also opined that Curl can occasionally lift and carry less than ten pounds; can frequently look up, down and turn her head right or left; can never climb ladders; and can rarely twist, bend, crouch, squat, and climb stairs.  R. at 497.  Moreover, Curl can use her hands and fingers to grasp, turn, twist objects and for fine manipulation only 10% of an eight hour workday; and use her arms for reaching 15% of the day.  *Id.*  Dr. Joven indicated that Curl's impairments are likely to

11

produce good days and bad days, and that she would likely be absent more than four days per month as a result of her impairments.  R. at 497-98.

### 2. Social Security Administration Consultative Exams

On or about July 18, 2008, as part of a prior application for disability benefits, Curl underwent a psychological evaluation by a consultative examiner.  R. at 214-19.  At that time, she presented as depressed and dysphoric, her affect was flat, her speech was slow and she appeared markedly discouraged.  R. at 216.  The examiner noted that Curl's capacity for abstraction appeared somewhat limited and her comprehension and understanding also appeared to be somewhat affected. R. at 217.  Further, Curl's general memory functioning appeared to be somewhat affected, particularly for remote memory.  *Id.*  Similarly, her concentration was also somewhat affected.  *Id.*  At that time, the examiner diagnosed Curl with Major Depressive Disorder, single episode, mild; Pain Disorder associated with both psychological factors and general medical condition; and a global assessment of functioning (GAF) score of 54.  R. at 219.

On August 6, 2012, Curl attended a consultative mental status examination by a social security examiner. R. at 303. She reported being depressed with worsening symptoms as her pain and other health issues worsen.  R. at 304.  Curl's symptoms included crying spells, difficulty sleeping, lack of appetite and hot flashes.  *Id.*  She reported being diagnosed with bipolar disorder approximately seven or eight years prior and having difficulties with anxiety as well.  *Id.*  She claimed that she does not like to be around people and needs one of her children to be with her if she has to go out anywhere such as the store.  *Id.* Curl reported that she believed her memory bad and she needs written out instructions to remember things like her medications.  *Id.*

The examiner noted that Curl ambulated with some difficulty, walking, sitting and rising slowly.  R. at 305.  She seemed to be of average intelligence.  *Id.*  Her mood was depressed and her affect was blunted, and she was tearful at times, although she was able to gather herself and continue.  *Id.*  Here thought process was organized and there was no evidence of tangentiality or circumstantiality.  *Id.*

Upon examination, Curl's short term recall was poor, being unable to recall three words after a five minute delay, and she was unable to perform serial 7's and had difficulty performing serial 3's.  R. at 306.  She was unable to calculate simple arithmetic problems.  *Id.*

Regarding her activities of daily living, Curl reported that she has to perform tasks differently than she used to and that it takes her longer to perform tasks.  R. at 307.  She has difficulty with bathing, standing, sitting, climbing up or down stairs, cooking and cleaning.  *Id.*

The examiner diagnosed her with Major Depressive Disorder, single episode, moderate, and a GAF of 59. *Id.*

On August 23, 2012, Curl attended a consultative physical examination. She reported back pain, 7/10, since surgery eight years prior that worsened after re-injuring her back the year before.  R. at 320.  At the time of the exam she was using crutches because she had recently injured her ankle.  *Id.*  Curl reported having some limitations on daily living, but dresses herself, showers independently and uses the bathroom without assistance.  *Id.*  She also reported being on Seroquel, which somewhat improved her mood, and on medication for an overactive bladder, which have helped reduce her trips to the bathroom by approximately half.  *Id.*

Upon examination, Curl had reduced grip strength, lower extremity flexion, and hip flexion bilaterally, each at 4/5.  R. at 321.  Generally, her muscle tone was normal and there was no evidence of atrophy or hypertonicity.  *Id.*  Although she apparently did need the crutches on the day of examination, the examiner noted that she was able to ambulate with the crutches without significant difficulty.  R. at 322.

On or about September 6, 2012, M. Brill, M.D. ("Dr. Brill"), a social security reviewing physician, completed a physical residual functional capacity assessment.  R. at 325-32.  Dr. Brill opined that Curl can lift and/or carry twenty pounds occasionally, ten pounds frequently, and can sit, stand and/or walk about six hours in an eight hour workday.  R. at 326.   She can only occasionally perform postural activities such as climbing, balancing, stooping, kneeling, crouching and crawling.  R. at 327.

On or about September 18, 2012, Kari Kennedy, Psy.D. ("Dr. Kennedy"), a social security mental health reviewing consultant, prepared a mental residual functional capacity assessment.  R. at 333-50.  Dr. Kennedy opined that Curl is moderately limited in the ability to understand, remember and carry out detailed instructions.  R. at 333. Further, based on the totality of the evidence in the file, Dr. Kennedy concluded that Curl is able to "understand, carry out and remember simple instructions; able to make judgments commensurate with functions of unskilled work; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with changes in a routine work setting."  R. at 335.

Dr. Kennedy also opined that Curl has mild limitations in activities of daily living and maintaining social functioning, but has moderate difficulties in maintaining concentration, persistence or pace.  R. at 347.

## D.  VOCATIONAL EXPERT TESTIMONY

Vocational expert, Cherise Powell ("VE"), testified at the hearing.   R. at 61-71. After reviewing with the VE Curl's relevant work history and the exertion level and other skill levels associated with each, the ALJ asked the VE to opine on the work that existed in the national economy if the person had a high school diploma with no transferable skills, could perform work at the light exertional level, but occasionally climb ramps, stairs, ladders, ropes and scaffolds; and occasionally balance, stoop, kneel, crouch and crawl. R. at 65.  Further, the person could perform tasks as a GED reasoning level of 3, as that term is defined in the Dictionary of Occupational Titles.  R. at 65.  The VE testified that such a person could be a cashier II, with approximately 22,000 jobs in Indiana and 1.1 million jobs in the United States; or a counter clerk, with approximately 2,800 jobs in Indiana and 111,000 jobs in the United States; or a shipping and receiving weigher, with approximately 1,800 jobs in Indiana and 76,000 jobs in the United States.  R. at 65-66.

If other factors remained the same, but the person could only perform sedentary exertinal level work, the VE testified that such a worker could perform the job of document preparer, with 1,700 jobs in Indiana and 99,000 jobs in the United States; or order clerk, with approximately 4,500 jobs in Indiana and approximately 19,000 jobs in the United States; or surveillance system monitor, with approximately 800 jobs in Indina and approximately 17,000 jobs in the United States.  R. at 66-67.

If the hypothetical person could also never climb ladders, ropes and scaffolds, the VE testified that there would be no effect on the number of jobs available.  R. at 67.  If the hypothetical person was further limited to standing/walking four hours in an eight-hour work day and sit for a total of up to six hours in an eight-hour work day, with respect to

the first set of jobs, the VE testified that the numbers would be reduced by 75% to account for the standing option; but there would be no change in the second set of sedentary jobs. R. at 67. Similarly, the VE testified that her estimates would not change if the hypothetical person was further limited to standing/walking up to four hours in an eight-hour work day, and sit for up to a total of four hours in an eight-hour work day. R. at 67-68.

If the hypothetical person could perform work but use a cane to stand/walk, the VE testified that none of the light, first set, of jobs would be available. R. at 68. However, there would be no change in the availability of the sedentary positions for a one-handed person. R. at 68-69. However, if this person were further limited to sitting for only 10 minutes at a time and standing for 15 minutes at a time, none of the jobs would be available. R. at 69-70. In addition, if the person needed a bathroom break every 60 to 90 minutes, there would be no jobs available. R. at 70. Moreover, the hypothetical person could be absent from work no more than once per month. R. at 70.

Finally, the VE opined that to engage in competitive work, a person much be able to work at no less than 90% productivity during an eight-hour work day, not including the typical morning, lunch and afternoon breaks. R. at 69.

## E.  RELEVANT ASPECTS OF THE ALJ'S DECISION

At the hearing, the ALJ stated that he attempted to obtain a medical expert for the hearing because of the musculoskeletal aspects of the case, but none were available. R. at 60. Therefore, he planned to proceed with an interrogatory to an orthopedist instead. R. at 60.

The ALJ found that Curl met the disability insured status requirements for purposes of DIB eligibility through March 31, 2013. R. at 13. He also found that curl had not

16

engaged in substantially gainful activity since her alleged onset date.   R. at 13-14. Further, the ALJ found that she had severe impairments, including back pain, post-surgery; and major depressive disorder.   R. at 14.   He declined to consider gastroesophageal reflux disease and her history of a small hiatal hernia severe because of a lack of medical records regarding limitations stemming from it.  R. at 14.  The ALJ also discounted Curl's testimony regarding her bipolar disorder and incontinence because there was no support in the medical record for those impairments limiting her physical or mental ability to perform work.  R. at 14.

In addition, the ALJ concluded that Curl did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d) & 416.926).  R. at 14.  To make this conclusion, the ALJ considered Curl's back issues under Listing section 1.04, Disorders of the Spine; and mental impairments under Listing 12.04, paragraph B and paragraph C.  R. at 14-16. Under paragraph B, he considered any restrictions on Curl's activities of daily living, which he found only mildly restricted; social functioning, which he also found only mildly affected; difficulties with concentration, persistence or pace, which he found were moderately affected.   R. at 15.   There was no evidence of any episodes of decompensation.  R. at 15.  Under paragraph C, the ALJ found no evidence in the record to support a finding under the "C" criteria.  R. at 15-16.

After considering the entire record, the ALJ determined that Curl had the residual functional capacity to perform work at the light exertional level except that she can stand and/or walk for up to a total of 4 hours in an 8-hour workday, and can sit for a total of 4

17

hours in an 8-hour workday.  She can occasionally climb ramps; can never climb stairs, ladders, ropes, and scaffolds; and can occasionally balance, stoop, kneel, crouch, and crawl.  She can understand, remember, and perform work tasks at GED Reasoning Level 03 (as defined in the Dictionary of Occupational Titles).  She can perform productive work tasks for up to an average of 98 to 100% of an 8-hour workday, not including the typical morning, lunch, and afternoon breaks.  R. at 16.  He further defined: (a) "light exertional" work as having the capacity to lift, carry, push or pull 20 pounds occasionally and 10 pounds frequently; stand or walk 6 hours in an 8-hour workday and sit 6 hours in an 8-hour workday, R. at 16 n.1 (citing 20 C.F.R. §§ 404.1567(b) and 416.967(b)); (b) "occasional" or "occasionally" as occurring very little up to one-third of the time, R. at 16 n.1 (citing Social Security Ruling 83-10); (c) work at a GED Reasoning Level 03 as applying commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form, and dealing with problems involving several concrete variables in or from standardized situations, R. at 16 n.1 (citing Dictionary of Occupational Titles, Appendix C).

The ALJ evaluated Curl's subjective complaints and concluded that her medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements regarding the intensity, persistence, and limiting effects of the symptoms were not entirely credible.    R. at 17-18.  Specifically, the ALJ looked at her complaints related to lower back pain and the medical evidence regarding her post-surgery status.  R. at 18.  He noted that there was no physical changes evidenced in the record and the treatment notes from February through July of 2012 belie that her back was interfering with her ability to engage in daily activity.  *Id.*  The ALJ also reviewed the

reasons she was sent home from work at a nursing home and reflected that it had nothing to do with any symptoms related to back pain but because she had a viral infection.  R. at 18-19.  Further, the ALJ reviewed more recent treatment records and the findings that Curl's musculoskeletal systems were normal.  R. at 19.  Finally, the ALJ discounted Curl's mental health complaints because she never sought mental health treatment.  *Id.* & *id.* n.3.  The ALJ did consider, however, the state agency's examiner's determination that Curl had a GAF score of 59, which suggest that as of the date of the examination, Curl had moderate symptoms or moderate difficulty in social, occupational, or school function, which the ALJ accounted for in his residual functional capacity determination.  R. at 19. In short, the ALJ took discrepancies in the record as evidence that Curl was exaggerating her symptoms and their effects.  R. at 20.

The ALJ gave Dr. Joven's September 19, 2013, letter and his physical residual capacity evaluation dated January 20, 2014, little weight.  R. at 20-21.  Specifically, the ALJ rejected the evaluation because it had too little meaningful rationale; Dr. Joven failed to define the terms "frequently" and "occasionally," which are terms of art and with which there was no evidence to conclude that Dr. Joven knew their meaning.  R. at 21.  The ALJ also relied on examples of discrepancies in Dr. Joven's records from his final evaluation.  *Id.*

Similarly, the ALJ gave the third-party statements little weight.  As to the neighbor, there was no evidence regarding the extent of the relationship between the neighbor and Curl and no specific observations or examples.  *Id.*  As to the opinion of Ashley Oslund ("Oslund"), a family member, the ALJ found it internally inconsistent that Oslund claimed that she spent 12 to 16 hours a day with Curl, but did not live with her.  *Id.*

19

On the other hand, the ALJ gave the state disability determination examiners' opinions significant weight because they were generally supported by the record.  R. at 21-22.  However, the ALJ rejected the physical examiner's opinion that Curl needed to ambulate with a cane, because the conclusion was inconsistent with the clinical observations and seemed to merely recite the notation made that she presented with a cane.  R. at 21-22.

The ALJ explained the basis for each of his conclusions regarding Curl's residual functional capacity, referring specifically to points in the record.  R. at 22.  He further rejected Curl's attorney's modifications to the residual functional capacity as they were given to the VE because they were not supported by the medical evidence and Curl's testimony alone could not support the restrictive limitations.  *Id.*

The ALJ adopted the VE's opinion that Curl could not perform her past relevant work as a tree trimmer, a certified nursing assistant or a stock clerk.  R. at 22-23.  The ALJ also adopted the VE's testimony that a person with Curl's residual functional capacity could perform the following jobs, which were available in significant numbers in the national economy:   Cashier II; Counter Clerk; Shipping and Receiving Weigher; Document Preparer; Order Clerk; and Surveillance System Monitor.   R. at 23-24.  Accordingly, the ALJ concluded that Curl was not disabled.  R. at 24-25.

## II. STANDARD

To be eligible for DIB or SSI,[1] a claimant must have a disability under 42 U.S.C. § 423.   "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. § 423 (d)(1)(A).   To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I.      If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II.      If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III.      If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV.      If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V.      If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step.  *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1505 *et seq.*  The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq.*  For convenience, only the DIB regulations are set forth herein.

of the Commissioner's denial of benefits.  When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner.  *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  This Court will sustain the ALJ's findings if they are supported by substantial evidence.  42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999).  "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).  In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ.  *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).  However, the "ALJ's decision must be based upon consideration of all the relevant evidence."  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  *See also*, *Craft*, 539 F.3d at 673.  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning."  *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).  *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))).  An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review."  *Craft*, 539 F.3d at 673.

# III. ANALYSIS

At the outset the Court takes issue with the parties' recitation of the facts of this case.  Curl's brief sets out a long series of facts regarding Curl's medical history, but none of them are dated either to provide the Court context or a path to trace the evidence (or lack thereof) in the ALJ's opinion.  The Secretary provided no factual context merely incorporating by reference the facts from the ALJ's opinion.  As a result, the Court spent considerable time wading through the record itself to ensure that this Court has an objective basis for its decision.  Future briefs utilizing a similar method will be struck and the offending party will be asked to file a revised brief in short order.

Turning now to the merits of this case, Curl asserts that the ALJ failed to properly address Curl's moderate limitations in maintaining concentration, persistence or pace. Dkt. No. 17 at 13.[2]  Specifically, Curl contends that the residual functional capacity has no restriction based on this specific limitation.  *Id.* at 13-14.  Further, the ALJ never addressed the evidence in the record that Curl had poor short-term recall; poor 5-minute recall; and difficulty with both series of 7's and 3's.  *Id.* at 14.  All of these, Curl asserts, would have an effect on her ability to maintain concentration or perform at pace, but the ALJ never asked the VE to address these limitations and never explained how they were accounted for in his residual functional capacity determination.  *Id.*  The only determination is contrary, where the ALJ concluded that Curl can perform productive work tasks for up to 98%-100% of an 8-hour work day.  Finally, Curl argues the Court should

---

[2] All pages numbers cited herein refer to the ECF page number, which appears at the top of each document filed; the page number may or may not correspond to the page number supplied by the filing party.

reject any attempt by the Commissioner to fill in any gaps in the ALJ's reasoning.  Dkt. No. 25 at 1-2.

The Commissioner claims that the ALJ accounted for Curl's moderate limitation in maintaining concentration, persistence or pace when he limited her to perform work at a GED Reasoning Level 03.  Dkt. No. 24 at 5-6.  The ALJ provided this limitation to the VE, who limited all of her recommended jobs to a specific vocational preparation number of no more than 2, which equates to unskilled work.  *Id.* at 6-7.  The Commissioner asserts that it is well-known that "a GED reasoning level of 3 means that the claimant must be able to 'apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form.  Deal with problems involving several concrete variable in or form standardized situations.'"  *Id.* at 7 (quoting *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (citing Dep't of Trans., App'x C(III))).

The Court agrees with Curl that the ALJ failed to account for his finding that she had moderate limitations in concentration, persistence and pace.  Although the Court agrees with the Commissioner that the ALJ specifically identified the GED reasoning level in his hypotheticals to the VE, there is no explanation in the ALJ's decision from which the Court can conclude that both the ALJ and the VE considered this a limitation on Curl's concentration, persistence and pace.  Further, as Curl points out, the ALJ's conclusion that Curl could perform productive work tasks for up to an average of 98%-100% of an 8-hour workday has no connection to a moderate limitation in concentration, persistence and pace.  Productivity of 98%-100% correlates with no limitation in concentration, persistence or pace, which is inconsistent with the ALJ's other findings.

Curl also argues that the ALJ erred when he failed to explicitly consider the factors in 20 C.F.R. § 404.1527(c), when he rejected Dr. Joven's residual functional capacity evaluation and letter that found Curl severely limited. Dkt. No. 17 at 17-19. Curl contends that this failure makes meaningful review of the decision impossible. *Id.* at 19. Moreover, Curl points out that the terms "frequently" and "occasionally" were defined on the form used by Dr. Joven and that the opinions of the examiners the ALJ relied on were similarly "check a box." *Id.* at 20. In addition, Curl asserts, the ALJ never properly addressed Dr. Joven's prescription for a cane and never, as he stated he would, had the evidence produced for treatment after December 2012 assessed by a medical expert. *Id.* at 20-21.

The Commissioner asserts that the ALJ properly assessed the medical evidence and rejected the opinions of Curl's treating physician. Dkt. No. 24 at 8-10. Specifically, the ALJ was entitled to reject Dr. Joven's opinions because they were unsupported by the medical records and consisted primarily of Curl's own subjective complaints. *Id.* at 8-9 (citing, *inter alia*, R. at 20-22 (ALJ's opinion)). Further, the Commissioner asserts that the difference between Dr. Joven's residual functional capacity assessment, which consisted solely of checked boxes and Curl's own complaints, and the state agency doctor's assessment was the level of detail in the state agency doctor's opinion, which included reasons for his findings. *Id.* at 9-10 (citing *inter alia*, R. at 326-27).

In this regard, the Court concludes that the ALJ's opinion is insufficient because it fails to articulate reasons to reject Dr. Joven's opinions under all of the criteria set forth in 20 C.F.R. § 404.1527(c). In addition, the Court cannot trace the path of the ALJ's reasoning with respect to the differences between Dr. Brill's opinion, with a check-a-box form and a few sentences and that of Dr. Joven, which was a letter, years of medical

history records, and a check-a-box form, such that he could reject Dr. Joven's opinion. Further, Curl had her cane with her at the hearing, testified that she used it as prescribed, and provided the prescription for it from Dr. Joven. The ALJ's rejection of this evidence was not thoroughly developed such that the Court could ascertain how he determined that Curl could perform work without using the cane, or how her performance might be limited thereby. Finally, the Court was troubled by the fact that the ALJ specifically stated at the hearing that he thought he needed an expert opinion because of the musculoskeletal aspects of the case and would get one, but never obtained such an opinion. In light of his recognition that he needed help, his failure to do so evidences that the ALJ may indeed have been "playing doctor," which is impermissible. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Lastly, Curl takes issue with the ALJ's conclusion that Curl's urinary incontinence is not a severe impairment because there was no medical evidence in the record to support the diagnosis. Dkt. No. 17 at 23-25. In fact, Curl asserts, the ALJ ignored the evidence in the record that she had been diagnosed with the problem was taking medication for it. *Id.* The Commissioner asserts that the ALJ correctly determined that it was not a severe limitation, but considered it in his analysis in the subsequent steps of the evaluation process. Dkt. No. 24 at 10-11 (citing, *inter ali*, R. at 14, 58).

The Court finds that the ALJ ignored the fact that Curl had been diagnosed with urinary incontinence and in fact was taking prescription medication that helped reduce her need to use the facilities. R. at 360-61. Because the ALJ failed to consider the effect

this might have on Curl's productivity and/or ability to remain focused on work-related tasks, the Court also concludes that he ALJ erred in this aspect of his analysis.

## IV. **CONCLUSION**

For the reasons stated herein, the Court has concluded that Defendant Carolyn W. Colvin, Acting Commissioner of Social Security erred in her decision to deny Plaintiff Jody Curl's application for Disability Insurance Benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423 & 1382c and REMANDS this matter for further proceedings pursuant to 42 U.S.C. § 405(g).  The Court will enter judgment accordingly.

IT IS SO ORDERED this 15th day of September, 2016.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov